

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_United States Bankruptcy Judge_

**Signed January 03, 2012**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| HEREFORD BIOFUELS, L.P., et al., | § | CASE NO. 09-30453-SGJ-7 |
| | § | |
| Debtors. | § | (JOINTLY ADMINISTERED) |

| | | |
|---|---|---|
| | § | |
| FACTORY MUTUAL INSURANCE, COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 10-03341 |
| | § | |
| PANDA ENERGY INTERNATIONAL, INC., | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION AND SUMMARY JUDGMENT INDEPENDENT OF PARTIES'
MOTIONS, PURSUANT TO FED. R. CIV. PRO. 56(f)</u>

<u>I. INTRODUCTION</u>

The above-referenced adversary proceeding (which has arisen, post-confirmation, in a bankruptcy case that involved an incomplete ethanol plant in Hereford, Texas) was commenced on October 27,

1

2010. The adversary proceeding has had a very busy procedural history since its filing, including:

(a) a Defendant's Motion to Dismiss or Abstain that was thoroughly briefed, opposed, argued, and denied [DE ## 11, 12, 27, 41, 57 & 58];

(b) a Defendant's jury demand that was objected to and ultimately stricken, followed by Defendant's motion for leave to take interlocutory appeal from the order striking jury demand, which interlocutory appeal was denied [DE ## 7, 14, 16, 17, 28, 29, & 94];

(c) counterclaims by the Defendant that were severed into a different adversary proceeding (Adv. Pro. 10-03422) and then abated [DE ## 15, 20 & 22];

(d) a Defendant's Motion for Withdrawal of the Reference that was opposed and denied [DE ## 23, 36, 48 & 93];

(e) cross motions for summary judgment, with regard to which Plaintiff's motion was denied and Defendant's motion was partially granted, on one discrete issue [DE ## 34, 66-72, 76-81, 91-92, 95-96, 114, 121, 131-134, 137, & 144];

(f) numerous discovery skirmishes [docket references omitted];

(g) a Defendant's Second Motion to Dismiss or Abstain, following the United States Supreme Court's landmark decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) [DE ## 166, 167, 170, & 176], which this court has denied in a separate order entered today; and, finally,

(h) the bankruptcy court's tentative summary judgment independent of the parties' motions, dated June 8, 2011, pursuant to Fed. R. Civ. Proc. 56(f)—with regard to which the parties were permitted to respond [DE ## 144, 168, 169, & 175].

All of the above-listed matters were thoroughly briefed and orally argued. Affidavits were submitted with significant documentary evidence. There have been numerous, lengthy status conferences and hearings before the court.

Pending now before the court are the parties' submissions in

response to the bankruptcy court's June 8, 2011 tentative summary judgment, independent of the parties' motions, pursuant to Fed. R. Civ. Proc. 56(f) [DE ## 144, 168, 169, & 175]. Based on these submissions and, viewing all evidence in a light most favorable to Defendant Panda Energy International, Inc., the court now rules that the Plaintiff, Factory Mutual Insurance Company, is entitled to and shall be granted a final summary judgment against Defendant, Panda Energy International, Inc., declaring that Panda Energy International, Inc. is estopped and enjoined from pursuing the claims that it is now pursuing against Factory Mutual Insurance Company in a Dallas State Court. This ruling disposes of the entire adversary proceeding at this juncture. Below are the relevant undisputed facts, the legal conclusions of the court, and the exact judgment being issued. All other pending requests of the parties are denied and objections overruled. To the extent there is an appeal of this final summary judgment to a higher court, and there is any future determination that the bankruptcy court did not have constitutional or statutory authority to enter this final judgment, this bankruptcy court respectfully urges that this final judgment be deemed a report and recommendation to the district court, *proposing* that the district court enter this judgment as its own. *See* 28 U.S.C. § 157(c)(1).

## II. JURISDICTION

This court has bankruptcy subject matter jurisdiction in the above-referenced adversary proceeding (the "Adversary Proceeding"), pursuant 28 U.S.C. § 1334(b). While the Adversary Proceeding has

arisen in a post-confirmation context, and is between two non-debtor parties, the disputes herein concern: (a) the interpretation and enforcement of a prior sale order of the bankruptcy court, under section 363 of the Bankruptcy Code; and (b) the definition of what was or was not property of the bankruptcy estate in the underlying bankruptcy case, pursuant to section 541 of the Bankruptcy Code.   Thus, the court determines that this is a core "arising in" proceeding, pursuant to 28 U.S.C. §§ 157(b)(2)(A), (O) & 1334(b).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is typically appropriate whenever a movant establishes that the pleadings, affidavits, and other evidence available to the court demonstrate that no genuine issue of material fact exists, and the movant is, thus, entitled to judgment as a matter of law.   Fed. R. Civ. Pro. 56(a); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004). A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the non-movant. *Piazza's Seafood World, LLC,* 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Material issues are those that could affect the outcome of the action. *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).   The court must view all evidence in a light most favorable to a non-moving party. *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp.

4

2d at 891.

Pursuant to Fed. R. Civ. Pro. 56(f), a trial court may consider entry of summary judgment on its own, independently, after having identified for the parties the material facts that the court believes may not genuinely be in dispute, and after giving the parties reasonable notice and time to respond. On June 8, 2011, after reviewing cross motions for summary judgment submitted by the parties (and denying those in substantial part), this court entered a tentative summary judgment, as contemplated by Rule 56(f), identifying for the parties the material facts the court considered to be not genuinely in dispute, and indicating for the parties how the court was inclined to rule in this Adversary Proceeding, based upon all of the summary judgment evidence that had been presented thus far. The bankruptcy court gave the parties reasonable time to respond to the tentative summary judgment, which they did [DE ## 168, 169 & 175]. This, now, is the bankruptcy court's final summary judgment, independent of the parties' motions, pursuant to Rule 56(f).

### IV. UNDISPUTED, MATERIAL FACTS

1. This Adversary Proceeding has arisen in connection with the bankruptcy case of Hereford Biofuels, L.P., a.k.a. Panda Hereford Ethanol, L.P. (hereinafter, the "Debtor"). The Debtor, along with three of its affiliates, filed Chapter 11 bankruptcy petitions (collectively, the "Bankruptcy Case") in the Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court")

on January 23, 2009.[1]

2.    The Debtor resorted to filing bankruptcy when it lacked necessary funds to finish construction on what was intended to be a state-of-the art, manure-fueled ethanol plant in Hereford, Texas (the "Hereford Ethanol Plant").   The Hereford Ethanol Plant was well over 90% complete when the Debtor filed for bankruptcy.

3.    In addition to the Hereford Ethanol Plant, among the other assets that the Debtor owned, when it filed for bankruptcy, were certain claims in an 8-count lawsuit, filed in October 2008 in Deaf Smith County, Texas (hereinafter referred to as the "Amarillo Action").[2]  Factory Mutual Appendix Ex. 1.[3]  The Debtor was actually a **co-plaintiff** in the Amarillo Action, along with various of its non-debtor affiliates, including its non-debtor parent company, Panda Energy International, Inc. ("Big Panda").[4]  *Id.*  Big Panda is the entity that is now the Defendant in the above-referenced

---

[1] The debtors in the Bankruptcy Case were Hereford Biofuels, L.P.; Hereford Biofuels Holdings, LLC; PHE I, LLC; and PHE II, LLC (sometimes collectively referred to as the "Debtors").

[2] The Amarillo Action was originally filed in a Deaf Smith County State Court but then later removed to the United States District Court for the Northern District of Texas, Amarillo Division in November 2008.  It was thereafter remanded to the Deaf County State Court many months later.

[3] References herein to "Factory Mutual Appendix Ex. __" refer to the Appendix of evidence that Factory Mutual submitted [*see* DE # 132] in response to the motion for summary judgment filed by Big Panda [*see* DE # 66].

[4] The non-debtor affiliates who were plaintiffs with the Debtor were Panda Energy Management, LP; PLC II, LLC; and Panda Energy International, Inc. (*i.e.*, "Big Panda").  The non-debtor co-plaintiffs were apparently investors in connection with the ethanol plant who allegedly sustained independent damages.

Adversary Proceeding.

4. The Amarillo Action (and all of its 8 counts) involved claims (sounding mostly in tort) regarding numerous things that allegedly went wrong, prepetition, in connection with the construction of the Hereford Ethanol Plant. *Id.* Among other things, the co-plaintiffs in the Amarillo Action were complaining of incompetence by a general contractor, fraud by the general contractor's parent and affiliates, and also bad acts by an insurance company—Factory Mutual Insurance Company ("Factory Mutual")—for failure to cover certain claims asserted under a builders risk policy that it issued in connection with the Hereford Ethanol Plant.

5. There were approximately a half dozen defendants ("Litigation Defendants") named in the Amarillo Action, including (as mentioned) Factory Mutual, who is now the Plaintiff in the above-referenced Adversary Proceeding. The other Litigation Defendants included GEA Group, AG ("GEA") (the parent company of the original general contractor on the Hereford Ethanol Plant); Kurt Torster ("Torster") (an officer of the general contractor); and Air Liquide S.A. and American Air Liquide Inc. ("Air Liquide"), which later purchased the general contractor from GEA. *Id. at* Appx. pp. 2-3. The general contractor itself—named Lurgi, Inc. ("Lurgi")—was not a party to the Amarillo Action but, rather, was in a separate arbitration proceeding with the Debtor.

6. Understanding the claims in the Amarillo Action is critically important to understanding the current Adversary

Proceeding. The claims in the Amarillo Action were as follows:

**Count 1:** The Debtor and co-plaintiffs claimed fraud, negligent misrepresentation and conspiracy against GEA and Torster, in connection with their alleged misrepresentations about the general contractor's wherewithal and construction capabilities, and with regard to an alleged "book building" scheme (*i.e.,* GEA and Torster are alleged to have engaged in a scheme to obtain lucrative turnkey construction contracts for Lurgi that were beyond Lurgi's capabilities to fulfill, then placed such jobs on Lurgi's accounting books, and then plotted to sell Lurgi at a high price based on these lucrative contracts in the "pipeline"—such that GEA would not be supporting Lurgi when Lurgi ultimately could not perform on its contracts).

**Count 2:** The co-plaintiffs asserted breach of a non-assignment clause and tortious interference against GEA and Air Liquide.

**Count 3:** The co-plaintiffs asserted breach of guaranty against GEA and Air Liquide.

**Count 4:** The co-plaintiffs asked for a declaratory judgment against Air Liquide (pertaining to the Debtor's draw on a letter of credit and whether it was wrongful as to Air Liquide).

**Counts 5-8:** These counts were asserted solely against Factory Mutual and were related to its *alleged failure to provide coverage in connection with certain physical loss and damage to the Hereford Ethanol Plant* and *for losses and expenses caused from delays in starting up the facility*. The claims consisted of breach of insurance policy, by the denial of coverage, common law bad faith insurance practices, violations of provisions of the Texas Insurance Code, and a request for attorneys fees.

Factory Mutual Appendix Ex. 1 at Appx. pp. 16-20.

7. On February 9, 2009, shortly after the Debtor filed its Bankruptcy Case, it filed a sale motion, pursuant to Section 363 of the Bankruptcy Code, seeking to sell everything it owned, pursuant to certain auction procedures. The Bankruptcy Court approved certain modified auction procedures.

8. The Bankruptcy Court later conducted a sale hearing and heard a report on the results of the auction. Big Panda Appendix Ex. 4.[5] The court ultimately approved the sale of the Hereford Ethanol Plant to the Debtor's primary secured lender, whose stated intention was to "moth ball" the more-than-90% completed facility, for some indefinite time period.

9. The court also separately approved a sale of the Debtor's so-called "Construction Litigation Claims" to a group of buyers that just so happened to consist of certain of the Litigation Defendants—*i.e.,* GEA and Factory Mutual, plus the general contractor, Lurgi ("Litigation Claim Buyers"). Big Panda Appendix Exs. 3, 4, & 6. The "Construction Litigation Claims" that were sold were defined to include, among other things, all rights of action held by the Debtors "against any and/or all of the Litigation Defendants as of the Closing Date, including the Rights of Action asserted in the Amarillo Action." Big Panda Appendix Ex. 3 at Appx. p. 79. This sale of the Construction Litigation Claims occurred pursuant to an Asset Purchase Agreement (Big Panda Appendix Ex. 4 at Appx. pp. 69-127) and the Bankruptcy Court's Order Authorizing the Sale of Construction Litigation Claims Free and Clear of Liens, Claims, Encumbrances and Interests, dated April 24, 2009 (the "Litigation Sale Order"), whereby (as described) the Litigation Claim Buyers purchased the claims of the Debtor asserted

---

[5] References herein to "Big Panda Appendix Ex. \_\_\_\_" refer to the Appendix of evidence that Big Panda submitted [*see* DE # 71] in support of its motion for summary judgment [*see* DE # 66].

in the Amarillo Action.[6]  Big Panda Appendix Ex. 6.

10.    After the Litigation Sale Order, confusion and controversy soon ensued in the Amarillo Action.  Why?  The Litigation Claim Buyers believed that they now controlled the Amarillo Action and would dismiss it.  However, recall that there were **_co-plaintiffs_** in the Amarillo Action:  the Debtors **_and non-debtor affiliates including Big Panda_**.  Big Panda essentially took the position that, **_as it was a co-plaintiff_**, it had **_claims of its own_** and it could still go forward with **_its_** claims in the Amarillo Action—notwithstanding the fact that **_the Debtors_** had sold their claims therein to the Litigation Claim Buyers.

11.    This confusion and controversy led to the filing, on or about May 8, 2009, of an adversary proceeding in the Bankruptcy Court, which the court will hereinafter refer to as "DJ Action #1" (Adversary Proceeding #09-03121, styled _The Official Committee of Unsecured Creditors, GEA Group, AG, Factory Mutual Insurance Company, and Lurgi, Inc. v. Panda Energy Management, L.P., PLC II, LLC, and Panda Energy International, Inc._).  Factory Mutual Appendix Ex. 8.  The Complaint brought in DJ Action #1, by the Litigation Claim Buyers[7] against Big Panda and certain affiliates, specifically articulated three counts:

**Count 1:** Seeking a declaratory judgment that the

---

[6]  The Litigation Claim Buyers paid $1.5 million to the bankruptcy estate, for the Construction Litigation Claims, plus a possible additional $500,000, depending on certain future events.

[7]  The Official Unsecured Creditors Committee appointed in the Bankruptcy Case was also a plaintiff in DJ Action #1.

Litigation Sale Order of the Bankruptcy Court, pertaining to the Construction Litigation Claims, was "lawful and enforceable under Texas law and bankruptcy law";

**Count 2:**  Seeking a declaratory judgment that Big Panda's alleged threats to collaterally attack the Litigation Sale Order were without merit and were in violation of the Bankruptcy Court's Litigation Sale Order (*e.g.,* Big Panda had made arguments that the Litigation Sale Order violated a joint prosecution agreement and fee sharing agreement that had existed among Big Panda and the Debtors, and also that the joint bid/acquisition by the Litigation Claim Buyers constituted an improper "Mary Carter Agreement" and a violation of the Texas Insurance Code); and

**Count 3:**  Seeking a declaratory judgment that all of the claims asserted in the Amarillo Action constituted property of the Debtors' bankruptcy estates (regardless of whom was named as a co-plaintiff) and, therefore, such claims were sold to the Litigation Claim Buyers, pursuant to the Asset Purchase Agreement and Litigation Sale Order.

Factory Mutual Appendix Ex. 8 at Appx. pp. 155-163.

12.    The DJ Action #1 Complaint reiterated multiple times that the plaintiffs therein (*i.e.,* the Litigation Claim Buyers) were seeking a declaratory judgment "that **all of the claims asserted in the Amarillo Litigation** belonged to the Debtor and [we]re property of the Debtor" (regardless of the fact that there were "co-plaintiffs" therein, including Big Panda). *Id.*

13.    DJ Action #1 was resolved, relatively swiftly, by a court-approved stipulation of the parties.  The parties entered into, and the Bankruptcy Court signed, on August 6, 2009, an "Order on (I) Motion to Dismiss or in the Alternative, to Stay, Transfer or Abstain and (II) Complaint for Declaratory Judgment" ("August 6, 2009 DJ Action #1 Order").  Factory Mutual Appendix Ex. 12.  In such order, Big Panda stipulated and the Bankruptcy Court decreed

that: (a) the sale of the Debtors' interest in the Construction Litigation Claims was lawful and enforceable and Big Panda "may not seek to directly or collaterally attack, or predicate any claim on, the Litigation Sale Order and the Purchase Agreement"; and (b) the rights to recover on Counts 2 through 8 in the Amarillo Action were property of the Debtors' estate and were deemed to have been conveyed to the Litigation Claim Buyers and would "not be asserted by [Big] Panda." *Id.* at Appx. p. 349.

14. The only matter left *unresolved* in the August 6, 2009 DJ Action #1 Order was whether *Count 1* in the Amarillo Action (for fraud, negligent misrepresentation, and conspiracy *against GEA and Torster*) was property of the estate or property of Big Panda (*i.e.,* a direct, independent claim of Big Panda that could be pursued as its own).[8] *Id.* at Appx. p. 35. In fact, it was clear, after the August 6, 2009 DJ Action #1 Order, that Big Panda would go forward in the Amarillo Action with Count 1 against GEA and Torster and the parties reserved all rights to argue whether Big Panda, in fact, had a direct, independent and viable claim.

15. It likely seemed to Factory Mutual that it was "home free" after the August 6, 2009 DJ Action #1 Order. Why? Because Factory Mutual had only been named as a Defendant in *Counts 5-8* of the Amarillo Action, and, as stated above, Big Panda had stipulated

---

[8] In other words, Big Panda was asserting that *it* was directly an aggrieved party (or it *and* the Debtors were aggrieved parties), as to Count 1, and that the Debtor could not sell in the Debtor's bankruptcy case Big Panda's *own* claim of injury.

that "the rights to recover on **Counts 2 through 8** in the Amarillo Action were property of the Debtors' estate and were deemed to have been conveyed to the Litigation Claims Buyers and would "**not be asserted by [Big] Panda**." Factory Mutual Appendix Ex. 1 & Ex. 12 at Appx. p. 349 (emphasis added).

16. But Factory Mutual soon realized that it was not "home free." Several months later, in April 2010, Big Panda filed a lawsuit in the 191st Judicial District Court of Dallas County, Texas (the "Dallas State Court Action") against Factory Mutual, and later added therein an insurance broker, Marsh USA, and an employee of Marsh USA named John Samuels. Big Panda Appendix Ex. 17; Factory Mutual Appendix Ex. 3.

17. The Dallas State Court Action, like the Amarillo Action, was **all about the Hereford Ethanol Plant**. *Id.* The petition therein (which has been amended many times) described that, in May 2005, Big Panda decided to begin development of an ethanol plant in Hereford, Texas, and thereafter formed a subsidiary for purposes of doing this (in July 2005). *Id.* at Appx. pp. 2-3. In June 2006, Factory Mutual issued a builder's risk policy to Big Panda's subsidiary, and Big Panda now took the position in the Dallas State Court Action that it was a **co-insured and/or a third-party beneficiary** under the builder's risk policy. *Id.* The petition in the Dallas State Court Action went on to state that, in early 2008, a claim was made by the policy holder or holders for damage to tanks and pipes at the Hereford Ethanol Plant. *Id.* The loss was

allegedly only partially paid. Then, in December 2008, the policy holder made a claim for delays in construction caused by a disease called "Q-Fever" that infected the work force at the Hereford Ethanol Plant. Apparently this claim was never paid. *Id.*

18. To further elaborate, in the Dallas State Court Action, Big Panda asserted the following claims against Factory Mutual: (a) breach of contract; (b) violations of provisions of the Texas Insurance Code (misrepresentations and unfair settlement practices); and (c) civil conspiracy. *Id.* at Appx. pp. 35-38.

19. Big Panda also asserted the following claims against Marsh USA (which acted as the intermediary in negotiating the placement of the insurance policy between Big Panda's subsidiary and Factory Mutual) and the employee named John Samuels: (a) violations of provisions of the Texas Insurance Code (misrepresenting the policy or failing to disclose material facts); (b) fraud and negligent misrepresentation (representation that Big Panda was an additional insured and had rights under the policy— and if this was not true, then there would have been a material misrepresentation); (c) breach of fiduciary duty (Marsh and Samuels were allegedly Big Panda's agent and broker but acted on Factory Mutual's behalf); (d) civil conspiracy; and (e) negligence. *Id.* at Appx. pp. 37-39.

20. More confusion and controversy ensued. There was a removal to federal court and then a remand back to state court of the Dallas State Court Action. Big Panda Appendix Exs. 18-19. Ultimately, this second/current Adversary Proceeding was filed—

14

which will henceforth be referred to as DJ Action #2. Big Panda Appendix Ex. 9.

21. In this DJ Action #2, Factory Mutual has asked this Bankruptcy Court to declare that Big Panda is barred from asserting the claims that Big Panda is asserting against Factory Mutual in the Dallas State Court Action by the doctrines of *res judicata* or judicial estoppel, because of: (a) either or both the Litigation Sale Order or the August 6, 2009 DJ Action #1 Order; and/or (b) statements made by Big Panda in DJ Action #1. Factory Mutual also seeks an injunction from this Bankruptcy Court, enjoining Big Panda from asserting the claims in the Dallas State Court Action against Factory Mutual. *Id.* at Appx. pp. 336-344.

## V. THE EARLIER CROSS MOTIONS FOR SUMMARY JUDGMENT

**A. The First Motion for Summary Judgment: Factory Mutual's.**

22. This court has previously denied a motion for summary judgment of Factory Mutual in this DJ Action #2. DE # 114.

23. In its motion for summary judgment, Factory Mutual had asked this court to determine that, as a matter of law, *res judicata* barred Big Panda's claims being asserted in the Dallas State Court Action, because the August 6, 2009 DJ Action #1 Order (with accompanying stipulations), provided that Counts 2-8 pending in the Amarillo Action were ***property of the Debtor's estate,*** would ***not be asserted by Big Panda,*** and Big Panda would **"*never take the position that these claims were not property of the estate sold pursuant to the Litigation Sale Order.*"** Recall that the specific

*Counts 5-8* in the Amarillo Action were claims against Factory Mutual for breach of contract, common law breach of good faith and fair dealing for alleged wrongful denial of claims and/or misrepresentation of coverage, and claims that Factory Mutual had violated provisions of the Texas Insurance Code.  Thus, Factory Mutual argued that Big Panda was doing in the Dallas State Court Action exactly what it agreed *not* to do (and was ordered not to do) in DJ Action #1:  it was pursuing Counts 5-8 from the Amarillo Action in a different forum and treating them as though they were its own claims—as though they were not property of the Debtor that were sold pursuant to the Litigation Sale Order.  DE # 34.

24.    The problem with Factory Mutual's motion for summary judgment was that it had a theme woven throughout that Big Panda had essentially *released* any direct claims it had against Factory Mutual through *statements* made during DJ Action #1 and as part of the stipulation entered in connection with the August 6, 2009 DJ Action #1 Order.  This was part and parcel to the *judicial estoppel* argument.  But there was also the *res judicata* argument—that *the August 6, 2009 DJ Action #1 Order* outright barred the prospect of Big Panda ever making any claims against Factory Mutual relating to the Hereford Panda Ethanol Plant.

25. Taking these issues in reverse, as a part of evaluating Factory Mutual's request for summary judgment on the *res judicata* issue, the court was required to determine—when viewing the summary judgment evidence in the light most favorable to Big Panda—

whether, as a matter of law:  (a) identical parties were involved in both DJ Action #1 and the Dallas State Court Action (here, the answer was, of course, yes, identical parties were involved); (b) the Bankruptcy Court had competent jurisdiction when it entered the August 6, 2009 DJ Action #1 Order (here, the court concluded yes, it did have jurisdiction in DJ Action #1); (c) the August 6, 2009 DJ Action #1 Order was a final judgment on the merits in DJ Action #1 (here, the court concluded yes, the August 6, 2009 DJ Action #1 Order *did* finally dispose of the issues in DJ Action #1); and (d) whether the *same claims and causes of action* were involved in DJ Action #1 and the Dallas State Court Action.  This fourth prong was—in the court's view—the problematic part of Factory Mutual's motion for summary judgment.  Why?  Because Big Panda was now swearing that it was asserting *different* claims in the Dallas State Court Action from what were being pursued in the Amarillo Action— and the problem was that one could not tell for sure, from the face of the petition filed in the Dallas State Court Action.  The court, thus, concluded that it could not, as a matter of law, determine that the *same claims and causes of action* were involved.  There seemed to be disputed material facts on this particular issue.  The court would have to peel back the onion further from what was apparent in the summary judgment record at that time.[9]

---

[9] The court believed that there were at least four possibilities for what was occurring with the new Dallas State Court Action.  The first possibility was that Big Panda was, indeed, reasserting (this time as allegedly its own direct claims) Counts 5-8 from the Amarillo Action.  If this was the case, there would clearly be an estoppel problem for Big Panda.  But the second possibility was that Big Panda

26.   Next, as a part of evaluating Factory Mutual's request for summary judgment on the ***judicial estoppel*** argument, this court was required to determine, when viewing the summary judgment evidence in the light most favorable to Big Panda, whether, as a matter of law:  (1) Big Panda, in pursuing the Dallas State Court Action claims, was suddenly taking a position that was clearly inconsistent with the statements it made and/or positions it took in DJ Action #1; (2) whether the court accepted and relied on Big Panda's prior statements and representations in DJ Action #1; (3) whether Big Panda's prior positions were not due to inadvertence or mistake; and (4) whether, if Big Panda was maintaining an inconsistent position in the Dallas State Court Action, allowing this to continue would allow Big Panda to derive an unfair advantage and would impose Factory Mutual with an unfair detriment. For the same or similar reasons that the court denied Factory Mutual's request for summary judgment on the ***res judicata*** issue, the court was compelled to deny summary judgment to it on this

---

was not asserting Counts 5-8 from the Amarillo Action but, rather, was asserting wholly different direct claims that it believed it had against Factory Mutual that it had never asserted in the Amarillo Action Litigation.  This might or might not be a problem.  The third possibility was that Big Panda was asserting claims or causes of action against Factory Mutual that were never asserted in the Amarillo Action (so were not part of Counts 5-8) but still would, nevertheless, have belonged to the Debtor's bankruptcy estate rather than Big Panda directly (this might present a standing problem for Big Panda, more than an estoppel problem).  The fourth possibility was that Big Panda was at least partly (perhaps with its civil conspiracy claim) asserting theories/claims relating to the joint bid by Factory Mutual and the other Litigation Claims Buyers for the Construction Litigation Claims (*i.e.*, claims of violations of the Texas Insurance Code and the "Mary Carter" Agreement theory).  This would seem to be a problem (as a collateral attack on the Litigation Sale Order).

*judicial estoppel* issue. There seemed to be clearly disputed fact issues as to whether Big Panda, in pursuing the claims in the Dallas State Court Action, was taking a position that was inconsistent with its stipulations and representations in DJ Action #1, that it would never pursue Counts 2-8 in the future and it would never challenge the Litigation Sale Order in the future. There seemed to be disputed issues of fact as to whether Big Panda was simply re-casting Counts 5-8 from the Amarillo Action against Factory Mutual (and treating them as though they were Big Panda's own direct claims) or whether something different and unique to Big Panda was being asserted in the Dallas State Court Action. If Big Panda was ultimately determined to simply be rehashing the old Counts 5-8 and disingenuously treating those counts now as its own, Big Panda would have a problem. If Big Panda was ultimately determined to be asserting something different and unique to it, it would prevail on the judicial estoppel theories being argued by Factory Mutual, because (as described further below) this court did not believe Big Panda ever *"released" or represented* that it had no direct claims against Factory Mutual and that it would never assert any if discovered.

**B.  The Second Motion for Summary Judgment: Big Panda's.**

27.  The court next had before it Big Panda's motion for summary judgment. DE ## 66-68 & 71.

28.  Big Panda, in its motion for summary judgment, essentially argued that (a) it was asserting unique, direct, independent claims that it had against Factory Mutual, relative to

the Hereford Ethanol Plant and coverage issues, (b) Big Panda never released its right to pursue *its own* claims against Factory Mutual in DJ Action #1 or otherwise in the Bankruptcy Case, (c) there was no genuine issue of material fact that contradicted any of this, and, thus, (d) Big Panda was entitled to judgment as a matter of law on Factory Mutual's estoppel claims in this DJ Action #2. Big Panda also argued that it was entitled to summary judgment in DJ Action #2 because the Anti-Injunction Statute (28 U.S.C. § 2283) precluded Factory Mutual's Complaint in this DJ Action #2.

29. The court, first, denied Big Panda's motion for summary judgment on the Anti-Injunction Statute theory. The court's reasoning on this issue is described in detail at DE # 144, and will not be repeated herein. In a nutshell, the court did not (and still does not) believe that the Anti-Injunction Statute bars this Adversary Proceeding and believes that the "*relitigation exception*" inherent in the Anti-Injunction Statute applies here. *Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 147 (1980).

30. The court, second, granted Big Panda summary judgment on Factory Mutual's estoppel/waiver/release claims in this DJ Action #2. Big Panda's argument was the "flip side" of what Factory Mutual's argument had been in its own motion for summary judgment, and primarily focused on Factory Mutual's recurring theme in this Adversary Proceeding (earlier mentioned) that Big Panda *released* or waived its right to pursue claims against Factory Mutual *through its statements and actions* in DJ Action #1.

31.    This court ruled that there was no genuine issue of material fact as to whether Big Panda released or waived its right to pursue claims against Factory Mutual **by its statements and actions in DJ Action #1**—rather, the court concluded that the summary judgment evidence was clear and undisputed that Big Panda only represented that it did not itself own claims 2-8 asserted in the Amarillo Action and would not itself assert those Counts 2-8 in the future and would not take the position that Counts 2-8 were not sold in the Litigation Sale Order and would not challenge the enforceability of the Litigation Sale Order.    Factory Mutual Appendix Ex. 10; Big Panda Appendix Ex. 29.   In other words, the court entered a very narrow Partial Summary Judgment declaring that **Big Panda, with its statements and stipulations in DJ Action #1, did not, as a matter of law, release or forego any right it might have had to pursue claims of its own (if any, it had) against Factory Mutual** and Big Panda **did not represent it had no claims of its own**—it only stipulated and agreed that it did not own Counts 2-8 then pending in the Amarillo Action.

32.   In granting Big Panda the Partial Summary Judgment, this court made clear that, just because the court concluded that Big Panda never **released** or **waived** its right to seek its own claims against Factory Mutual in DJ Action #1, this did not mean that Big Panda was not still barred or estopped from pursuing its claims in the Dallas State Court Action.

## VI. SUMMARY JUDGMENT INDEPENDENT OF THE PARTIES' MOTIONS

33.   This court notified the parties on June 8, 2011, that, after reviewing all of the briefing and summary judgment evidence that had then been filed, the court believed it was appropriate to do something somewhat unusual.  The court was prepared to utilize new Fed. R. Civ. Pro. 56(f) and consider entry of summary judgment on its own, independently, after having identified above for the parties the material facts that the court believes may not genuinely be in dispute, and after giving the parties a reasonable notice and time to respond.

34.   To clarify, this court announced [*see* DE # 144] that it would be inclined, based on all of the summary judgment evidence that had been presented thus far, and based on the facts that appeared not to be in genuine dispute, to enter a summary judgment independent of the filed motions for summary judgment, which judgment would declare that Big Panda's claims asserted in the Dallas State Court Action were barred by the Litigation Sale Order and by the Debtor's Bankruptcy Case more generally, for the following legal reasons that were slightly different from what the parties argued in their respective motions for summary judgment.

35.   First, the court believed that certain of the claims being asserted by Big Panda in the Dallas State Court Action, even if never articulated prior to the Litigation Sale Order or prior to the August 6, 2009 DJ Action #1 Order, were aimed at recovery of what is, or was, property of the Debtor's bankruptcy estate (thus, Big Panda should be deemed estopped from asserting such claims,

because Big Panda is improperly attempting to exercise control over property of the estate).

36.    Second, the court believed that certain (if not all) of the claims being asserted by Big Panda in the Dallas State Court Action (initially, the court was thinking at least the civil conspiracy claims), would be barred by the Litigation Sale Order—as an improper collateral attack on the Litigation Sale Order.

37.    To further elaborate, it is undisputed that Big Panda's Claims, as presently pleaded in the Dallas State Court Action, relate to that certain Builder's Risk Policy No. LG078, issued by Factory Mutual, with effective dates of coverage from July 20, 2006 to September 30, 2008, covering the Debtor's real and personal property at County Road 8, Hereford, Texas  79045 (*i.e.,* the Hereford Ethanol Plant owned by the Debtor).  *See* Factory Mutual Post Argument Brief [DE # 132-1], Ex. 3-A, Appx. p. 44; also, previously submitted to the court as Exh. 8 to Big Panda's Motion to Dismiss, DE # 12-8].  The Builder's Risk Policy only provided coverage in the event of physical loss or damage to the real and personal property at the Hereford Ethanol Plant.  *See* Factory Mutual Post Argument Brief [DE # 132-1], Ex. 3-A, Appx. p. 44.  It appears that any proceeds paid on behalf of a claim made under the insurance policy would be to repair, rebuild, or replace damaged property (or to pay the actual cash value of the property if it is not repaired, replaced, or rebuilt) and/or to reimburse the insured for actual loss sustained of gross earnings directly resulting from physical loss or damage insured under the Insurance Policy.  *Id.* at

Appx. p. 47. The Debtor was the named insured on the actual Insurance Policy. *Id.* at Appx. p. 43.

38. Big Panda's claims in the Dallas State Court Action appear to be all premised on the notion that Big Panda directed its broker Marsh USA, who was acting through its agent and "client executive" John Samuels, and as a dual agent of Big Panda and Factory Mutual,[10] to purchase a policy identifying **Big Panda** (not merely the Debtor) as a named insured with regard to the policy covering the construction of the Hereford Ethanol Plant. Big Panda urges that it, as a parent and investor in the special-purpose construction entity (*i.e.,* the Debtor) that was set up to own the Hereford Ethanol Plant, had an insurable interest, just as the Debtor did. Big Panda cites to certain evidence that the policy should have been set up with Big Panda as one of the named insureds (or maybe even as the one and only named insured), and even may have actually been set up this way, but, at the end of the day, the Debtor was treated and regarded as the sole insured. Big Panda is arguing, in essence, that either it was, in reality, a named insured on the policy, that had a separate right to sue for proceeds thereunder, or alternatively, if Big Panda was not a named insured, it should have been (*i.e.,* a competent and prudent broker

---

[10] Big Panda describes itself and its subsidiaries as "clients" of Marsh and John Samuels, and also describes Marsh as a "dual agent" (at least in certain states, including Texas) in that Marsh acts as the agent for an insurer, in selling insurance to a policy holder, and also as a common law or statutory agent of the policyholder, advising the policyholder and advocating on its behalf to obtain favorable insurance. *See* Big Panda Supplemental Appendix Ex. 1, ¶¶ 20-22 [DE # 169-1].

should have insured the risks through "an omnibus insured clause"), and this was Big Panda's expectation; thus, either way, Big Panda is entitled to sue as a covered entity, or else sue for fraud, civil conspiracy, *etc.*, for the failure to set up the insurance policy where there was coverage to Big Panda.  Among other things, Big Panda argues that having the whole family of companies named on a policy like the Builder's Risk Policy protects against the insurer suing the ultimate parent if the insurer pays a claim for injury to a subsidiary (because at common law, an insurer cannot subrogate against its own insured); and it also prevents, in the event of a bankruptcy of an insured, the loss of control over the policy by non-bankruptcy insureds, so as to guard against collusion between the insurer and other parties not aligned with the parent (such as what happened here—according to Big Panda).  Finally, Big Panda argues that the purpose of a builder's risk policy is to protect the insurable interest of the owner of the plant, all the investors, and all the lenders. *See* Factory Mutual Post Argument Brief [DE # 132-1], Ex. 1, Appx. pp. 1-16.

39.  Big Panda has specifically asserted the following Counts in the Dallas State Court Action:

**Count 1:**  Breach of an authorization to bind (arguing that a so-called "ATB," or authorization to bind, was in place and was an agreement to place or provide the policies that were described therein (including the Builder's Risk Policy) in a manner that would provide coverage for Big Panda as well as the Debtor and other affiliates).

**Count 2:**  A claim for Reformation—based on fraud or mistake as to the policies (by not naming Big Panda as an insured).

**Count 3:** Violations of Chapter 542 of Texas Insurance Code—denial of coverage; allegedly Factory Mutual violated this law as to Big Panda, as well as to the Debtor, for failure to provide for the "prompt payment of claims."

**Count 4:** Violations of Chapter 541 of Texas Insurance Code—the conduct of Factory Mutual and its agents heretofore described allegedly constituted "unfair or deceptive insurance practices" in violation of this statute.

**Count 5:** Breach of Fiduciary Duty and Negligence—based on Marsh USA's and John Samuels' alleged negligent acts and their alleged placing of their own interests ahead of their client (and Factory Mutual allegedly would be liable under doctrine of respondeat superior).

**Count 6:** Civil Conspiracy—Factory Mutual, Marsh USA and John Samuels (or some combination of them) allegedly combined to accomplish an unlawful purpose (it is somewhat unclear if this relates solely to the original placement of the insurance to omit Big Panda as a named insured or partially relates to the Bankruptcy Case auction—while Big Panda's current Complaint does not itself mention the auction *per se*, paragraph 41 of the Complaint hints at this a little, and Big Panda's oral arguments in this court have hinted at it a little). Again, this count is a bit ambiguous. At one point, at paragraph 13 of Big Panda's current Complaint, Big Panda states that "Factory Mutual and others forced [the Debtor] into bankruptcy." This appears to be part of the alleged conspiracy as well.

**Count 7:** Asserted against Marsh USA and John Samuels only, for their alleged violation of Section 4001.053 of the Insurance Code, in that they were allegedly not license insurers and allegedly sold insurance without a written appointment on behalf of Factory Mutual.

*Id.* at Appx. pp. 11-15.

40. Since the Bankruptcy Court issued its tentative summary judgment independent of the parties' motions, on June 8, 2011, the Bankruptcy Court has received supplemental briefing from the parties [DE ## 168, 169 & 175] and heard oral arguments. The

Bankruptcy Court is now prepared to issue a judgment declaring that Big Panda is estopped and barred from pursuing its claims in the Dallas State Court Action for the following reasons:

**Reason #1:** Even if Big Panda was or should have been a co-insured (or primary insured) on the Factory Mutual Builder's Risk Policy, it would not have had entitlement to the ***proceeds*** of the policy (for losses regarding the settlement of the tanks and Q fever at the Hereford Ethanol Plant) in addition to the Debtor's rights in the proceeds. At the end of the day, the Bankruptcy Court believes that it really does not matter whether Big Panda was a named insured or co-insured beneficiary on the Builder's Risk Policy or not. The ***proceeds*** on any claim adjusted on the policy would have properly gone to the Debtor, as the property owner. Big Panda is estopped generally from pursuing proceeds under the Builder's Risk Policy because this was property of the estate and it has no standing to pursue property of the estate.

**Reason #2:** Even if Big Panda could have some separate interest in the proceeds of the Builder's Risk Policy or some direct claims of its own against Factory Mutual, Big Panda is nevertheless estopped from pursuing such claims now by the Litigation Sale Order. Big Panda's claims are barred because all of the claims ***of the Debtor*** against Factory Mutual under the Builder's Risk Policy and/or relating to the Hereford Ethanol Plant were sold ***free and clear of all interests***. Big Panda's unliquidated, disputed claims relating to the Builder's Risk Policy (*i.e.,* "we should have been co-insured or primary insured," *etc.*) were a type of "interest" against the claims, of which Factory Mutual and the other Litigation Claim Buyers purchased the claims free and clear. While it is true that the April 2009 Litigation Sale Order authorized a sale of only the ***Debtor's*** claims, it authorized that sale free and clear of anyone else's interests in them.

**A.  Proceeds of the Builder's Risk Policy were Property of the Estate.**

41.    Regardless of any of the above-described Counts and theories of Big Panda, the Builder's Risk Policy was essentially a ***property policy*** that provided coverage in the event of loss or

damage to specific insured property—*i.e.,* the Hereford Ethanol Plant—and because that property was property of the Debtor's estate, any right to proceeds from that policy was also property of the Debtor's estate. Big Panda is fundamentally seeking damages for Factory Mutual's denial of a claim for tank settlement at the Hereford Ethanol Plant and for the construction delays caused by an outbreak of Q Fever there.

42. There is no dispute that the Debtor owned the ethanol plant. There is no dispute that this Builder's Risk Policy related to the ethanol plant. It covered losses associated with the plant. Regardless of the name(s) listed on the policy, any proceeds ultimately realized from the policy would have related to *the plant*.

43. If the Builder's Risk Insurance Policy had named Big Panda as a co-insured, that would not have changed the character of the policy proceeds as property of the Debtor's estate. This Builder's Risk Policy was essentially a property policy, pertaining to property of the Debtor's estate, and the proceeds would essentially be a change in the form of the property of the estate. Under the analysis of various case law, including the Fifth Circuit's *Louisiana World Exposition* case, *Edgeworth* case, and *Equinox* case, as well as the *Asay* case out of the Northern District of Texas, this court believes the Debtor would have had the right to keep and receive the proceeds of the Builder's Risk Policy, if and when the insurer had paid—not the Debtor's equity owner who did not itself own the property. *La. World Exposition*, *Inc. v. Fed.*

*Ins. Co. (In re La. World Exposition, Inc.)*, 832 F.2d 1391 (5th Cir. 1987); *Houston v. Edgeworth (In re Edgeworth),* 993. F.2d 51 (5th Cir. 1993); *Unsecured Creditors Disbursement Comm. v. Antill Pipeline Constr. Co. (In re Equinox Oil Co., Inc.),* 300 F.3d 614 (5th Cir. 2002); *First State Bank v. Asay (In re Asay)*, 184 B.R. 265 (Bankr. N.D. Tex. 1995).

44.    In the case of *Louisiana World Exposition*, the Fifth Circuit distinguished titular ownership of an insurance **policy** versus ownership of the **proceeds** of such a policy, holding that the proceeds of certain directors and officers (D&O) liability insurance policies were not part of a corporation's bankruptcy estate even though the policies were purchased and owned by and in the name of the corporation. *La. World Exposition*, 832 F.2d at 1398-1401. Specifically, the Fifth Circuit stated, "Ownership of a policy does not inexorably lead to ownership of the proceeds." *Id.* at 1401.

45.    Whether proceeds of an insurance policy are "property of the estate" depends upon the nature of policy. The central question in deciding whether insurance proceeds associated with a policy are "property of the estate" is whether, in the absence of a bankruptcy proceeding, proceeds would belong to the debtor when the insurer pays on a claim.

46.    The Fifth Circuit case of *Edgeworth* gave various examples of insurance policies whose proceeds are property of the estate: those being casualty, collision, life and fire insurance policies in which the insured debtor is a beneficiary. *Edgeworth*,

993 F.2d at 56.

47.    In the *Asay* case, which was a case dealing with property insurance proceeds (after a fire at the debtor's place of business) and whether the proceeds were property of the estate, the court noted that, at 11 U.S.C. § 541 of the Bankruptcy Code, "property of the estate" is defined as consisting of "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). *Asay*, 184 B.R. at 266. In *Asay*, since the debtor owned the building that was the subject of a fire as of the commencement of the case, the building became estate property, and the concept of property of the estate includes any proceeds from the property of the estate. The court found that the insurance proceeds were proceeds of the building and were property of the estate (overruling an argument to the contrary of a loss-payee on the policy—whom the court said merely had a security interest that was entitled to some adequate protection—but the proceeds themselves belonged to the owner of the building). The insurance proceeds were considered to be a change in form of estate property. *Id.* at 266-69.

48.    Several courts have concluded that the proceeds of casualty, fire, and theft insurance are property of the estate of the property owner. *See discussions* in above-cited cases.

49.    In summary, Big Panda—even if it was or should have been a named insured on the Factory Mutual policy—would not have had rights or an interest in the ***proceeds*** of the policy (for losses regarding the settlement of the tanks and Q fever) in addition to

the Debtor's rights in the proceeds. At the end of the day, the court believes that it really does not matter whether Big Panda was a named insured or co-insured beneficiary on the Builder's Risk Policy or not. The **proceeds** on any claim adjusted on the policy would have properly gone to the Debtor, as the owner of the plant. Big Panda's Dallas State Court Action should be estopped as an improper attempt to exercise control over what was property of the Debtor's bankruptcy estate (*i.e.*, proceeds of the Builder's Risk Policy).

**B.    The Dallas State Court Action is Precluded by The Litigation Sale Order.**

50.    But even if Big Panda **might** have had some independent rights in the policy proceeds if it had been a named insured, and even if Big Panda **might** have some direct claims or causes of action of its own (contractual, tort, or otherwise) against Factory Mutual, it is still now barred from pursuing its claims in the Dallas State Court Action because of this court's Litigation Sale Order.

51.    To be clear, Big Panda's position has evolved or, alternatively, has only been revealed in stages in the various litigation in the Bankruptcy Court.

> (a)  Early on, Big Panda simply stated that it **did not own and would not assert the claims asserted by the Debtor in Counts 2-8 in the Amarillo Action**, including all counts asserted against Factory Mutual. Big Panda Appendix Ex. B (August 6, 2009 DJ Action # 1 Order). The court can only conclude that Big Panda, at the time of making these stipulations, either had not fully analyzed/determined whether it

might have its own claims against Factory Mutual (but wanted to preserve the right to assert any) or did not feel the obligation to explicitly reveal at that time that it thought it might have its own claims against Factory Mutual.

(b) Then, many months later, in filing the Dallas State Court Action, Big Panda for the first time took the position in court proceedings that it was *a co-insured (i.e., additional insured) and/or a third-party beneficiary* under the Builder's Risk Policy and, in such a capacity, *had its own claims*. Thus, Big Panda's position evolved from "we don't own the claims in the Amarillo Action and won't assert them" to "we have our own claims as a co-insured or third-party beneficiary" under the Builder's Risk Policy. This third-party beneficiary/co-insured position seemed somewhat problematic to the Bankruptcy Court. Why? The primary insured (the Debtor) had sold all of its claims under the Builder's Risk Policy free and clear of *any interests*. *See* 11 U.S.C. § 363(f). It seemed to the Bankruptcy Court that any claim of a third-party beneficiary or co-insured relating to the policy would either be derivative of the Debtor's as the primary insured (not direct claims) or simply an *interest* in the claims, of which the sale was made free and clear. Notably, not only does section 363(f) of the Bankruptcy Code permit a sale of an asset (such as a claim) free and clear of all interests, but section 363(h) of the Bankruptcy Code even allows a trustee or debtor-in-possession to sell a *co-owner's* interest in property of the estate. And, without addressing whether a co-insured or a third-party beneficiary can seek damages under Texas insurance statutory or common law for breach of good faith if it believes that an unfair settlement has occurred (*i.e.*, assuming the bankruptcy sale could be viewed as a settlement), any such claim months later would seem to be a collateral attack on the Litigation Sale Order.

(c) Most recently, Big Panda's position has evolved to an argument that it should have been the primary insured (*i.e.*, *the "named*

insured" or **"first named insured,"** with authority to receive and direct the payment of proceeds) under the Builder's Risk Policy, and Big Panda was not put on the policy as the named insured, and this fact was actionable and caused Big Panda to suffer damages. Big Panda seeks reformation of the policy and the ability to seek damages for failure to cover. This position has required the court to engage in the exercise of "let's pretend." In other words, let's pretend that the Builder's Risk Policy was set up the way Big Panda now asserts that it should have been, with Big Panda as the primary insured (even though Big Panda was not the property owner of the Hereford Ethanol Plant). Who would have been entitled to the proceeds from the policy? Case law cited in the previous section suggests the Debtor. Titular ownership of a policy does not necessarily mean that such owner is entitled to the proceeds. But even if this court is wrong in assuming that the Debtor would still have been entitled to the proceeds of the Builder's Risk Policy (as the property owner), the court still believes that Big Panda's Dallas State Court Action is now barred from going forward. Why? Because all the claims of the Debtor under the Builder's Risk Policy were sold **free and clear of any interests**.

52.    Without a doubt, Big Panda's unliquidated, disputed claims relating to the Builder's Risk Policy (*i.e.,* "we should have been co-insured or primary insured," *etc.*) were a type of "**interest**" against the claims (*i.e.,* the Construction Litigation Claims), of which Factory Mutual and the other Litigation Claim Buyers purchased the claims free and clear. *See* 11 U.S.C. § 363(f). While it is true that the April 2009 Litigation Sale Order authorized a sale of only the **Debtor's** claims, the Litigation Sale Order authorized the sale **free and clear of anyone else's interests in them**. Big Panda states that it had/has its **own** claims and

causes of action relating to the Builder's Risk Policy. But this is really semantics. Just as a debtor-in-possession might sell real property in a bankruptcy case free and clear of a secured lender's lien or an M&M lien (with any such liens attaching and assertable against the sale proceeds), a debtor-in-possession can sell a claim or a right (or any other asset of the debtor) free and clear of *an interest*. This is precisely what happened here. Big Panda may arguably have had a legitimate claim to the policy proceeds (under a theory that Big Panda should have been named as the/an insured way-back-when). But, prior to any litigation regarding this, Big Panda's claims were, at best, an inchoate encumbrance or interest, of sorts, impairing the policy and proceeds. When the April 2009 Litigation Sale Order became final, the purchasers (*i.e.,* Litigation Claims Buyers) took the Debtor's claims free of Big Panda's inchoate interests in/against the Builder's Risk Policy.

53. This court is particularly worried about the importance of the finality of bankruptcy sales, a policy embodied in Section 363(m) of the Bankruptcy Code. The court initially was merely concerned that Big Panda's *conspiracy* claims seemed to be a thinly disguised attack on the Litigation Sale Order. As mentioned earlier, Big Panda's civil conspiracy count is somewhat ambiguous, but it seems to be primarily that Factory Mutual (and the other defendants in the Dallas State Court Action) schemed to put the Debtor, the subsidiary (not Big Panda, the parent) as the named insured on the Builder's Risk Policy; then played "hard ball" by

refusing to pay claims of the Debtor; thus, forcing the Debtor into bankruptcy; then bought back the claims against Factory Mutual during the bankruptcy case (which it allegedly would not have been in a position to do, if the parent Big Panda had been the named insured/controller of the Builder's Risk Policy). These civil conspiracy claims clearly seem barred under Section 363(m) of the Bankruptcy Code as a collateral attack on the Litigation Sale Order. The *Regions Bank* case from the Eighth Circuit suggests that it is really not the concept of *res judicata per se* that applies here, since Section 363 sales are *in rem* proceedings. *Regions Bank v. J.R. Oil Co.,* L.L.C., 387 F.3d 721, 732 (8th Cir. 2004). It is just the nature of the rights transferred in a Section 363 Sale Order. A Section 363 Sale Order effectuates a transfer that is good against **the world**—not just **parties**, as in the case of *res judicata*. *Id.* at 731-32.

54. But it is not just the civil conspiracy claims that are barred by the Litigation Sale Order and the provisions of section 363(f) of the Bankruptcy Code. Again, regardless of the verbiage chosen by Big Panda ("these are our own direct claims"), the fact is that Big Panda's disputed, inchoate claims (*i.e.,* "we should have been co-insured or primary insured," *etc.*) were a type of "interest" against the claims (*i.e.,* the Construction Litigation Claims), of which Factory Mutual and the other Litigation Claim Buyers purchased the claims free and clear.

55. As Judge Posner similarly wrote for the Seventh Circuit in a case called *Gekas*, a proceeding for judicial approval of a

sale of a debtor's assets is an *in rem* proceeding; it transfers property rights, and property rights are good against the world, not just against parties to judgment or persons with notice of proceeding. He further noted that judicial sales confirmed by bankruptcy courts, which are final judicial orders, can be set aside only by appeal or under Rule 60(b) and unless bankruptcy sales are final when made, rather than subject to being ripped open years later, high prices will not be offered for the assets of bankrupt firms—and the principal losers (pun intended) will be unsecured creditors. *Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012, 1016-19 (7th Cir. 1988).

56. The Seventh Circuit characterized a lawsuit that did not seek to rescind a sale but instead sought damages from those who benefitted from the sale as a "thinly disguised collateral attack on the judgment confirming the sale." *Id.* at 1018. Similarly, the court believes that this is how it must characterize Big Panda's Dallas State Court Action here.

57. Big Panda has argued that Factory Mutual used money that Factory Mutual set aside to pay claims under the Builder's Risk Policy to ultimately purchase the claims the Debtor was asserting under the Builder's Risk Policy. Big Panda argues that this was wrong. It was fraudulent and implicates a conspiracy with the joint bidders. Big Panda also argues it might even violate the Texas Insurance Code. This is an attack on the sale, pure and simple. The court believes, similar to the holding in *Abbotts Dairies*, that "when a bankruptcy court authorizes a sale of assets

pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 (3d Cir. 1986). Good faith in the context of a bankruptcy sale speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders. *Id.* at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir.1978)). *See also Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (also adopting *Rock Indus.* definition of good faith).

58.    Section 363(n) complements the court's authority to withhold approval of sales lacking in good faith, by reason of finding collusion between the purchaser and other bidders, by granting the trustee the express power to avoid a sale "if the sale price was controlled by an agreement among potential bidders at such sale . . . ." It follows that if a sale can be avoided because the price was controlled by potential bidders that it should not be approved if the court finds that the potential bidders have controlled the price.  But this is not all that good faith is about.  When the court approved Factory Mutual's and the other bidders' joint bid of the claims relating to the Builder's Risk Policy, and found them to be acting in good faith, and when no one appealed or moved to set aside that order under Rule 60, this cut

off the ability of anyone to make the type of fraud and civil conspiracy claims that Big Panda is now making.

59.    But, again, it also cut off Big Panda's ability to assert other claims relating to the Builder's Risk Policy.  As stated earlier, even if Big Panda should have been a named insured, and this was somehow covertly and conspiratorily prevented, Big Panda's claims—its disputed, unliquidated and inchoate claims against Factory Mutual relating to the Builder's Risk Policy—**were an interest** of which Factory Mutual and the other Litigation Claim Buyers took free and clear.  Section 2.1 of the Asset Purchase Agreement approved by the Bankruptcy Court stated that the Debtor was selling the Construction Litigation Claims "free and clear of all Liabilities and Liens."  The "Construction Litigation Claims" were defined as including all "Rights of Action held by any of the Sellers against any and/or all of the Litigation Defendants as of the Closing Date, including those Rights of Action asserted in the Amarillo Action" and all "Rights of Action held by any of the Sellers against any Person not presently named in the Amarillo Litigation  .  .  . but that could be brought presently or in the future related to the subject matter of the Amarillo Litigation." "Rights of Action" were defined as "any and all rights, claims . . ., lawsuits, causes of action . . .of any kind whatsoever" and "Lien"—notably—was defined as any security interest, pledge mortgage, lien, charge, hypothecation, **adverse claim of ownership . . .any interest in**, or other encumbrance of any kind or character" (emphasis added).  Section 5.5 of the Asset Purchase

Agreement stated that "Except as might otherwise be determined by the Declaratory Judgment [*see* Section 8.2 of the Asset Purchase Agreement which contemplated DJ Action #1], no Affiliate of the Sellers has any interest in any of the Construction Litigation Claims." *See* Big Panda Appendix Ex. 4 (the Asset Purchase Agreement).

60. In conclusion, accepting every fact Big Panda has pleaded as 100% true, its claims are barred by the Litigation Sale Order and are barred by the Bankruptcy Code's definitions of property of the estate. Taking these in reverse order, the right to proceeds under the Builder's Risk Policy belonged to the Debtor (as the property owner) and were its to sell. But, even if not all of the proceeds did belong (or should have belonged) to the Debtor, the sale of the Construction Litigation Claims was accomplished free and clear of any third-party's interest in them or claims of adverse ownership in them. This included Big Panda's alleged interest. It is undisputed that Big Panda had notice of the sale of the Construction Litigation Claims and did not choose to appeal the Litigation Sale Order.

## VII. CONCLUSION AND JUDGMENT PURSUANT TO FED. R. CIV. PRO. 56(f)

Based upon the foregoing, **IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DECLARED** that:

1. Big Panda's claims in the Dallas State Court Action are **BARRED AND ESTOPPED** as an improper exercise of control over what was property of the Debtor's bankruptcy estate (*i.e.,* such property of the estate having been the right to proceeds in the Builder's

Risk Policy, which right was sold).  Such claims must be dismissed; and

2.  Big Panda's claims in the Dallas State Court Action are **BARRED AND ESTOPPED** by the Litigation Sale Order, specifically under the doctrines of estoppel, *res judicata*, and due to the finality of the Litigation Sale Order.  The Litigation Sale Order approved a sale of the Debtor's claims against Factory Mutual free and clear of all *interests*—Big Panda's claims now asserted are the type of interest that the Litigation Sale Order extinguished.  Big Panda's claims must be dismissed; and

3.  Big Panda is **ENJOINED** from further pursuing its claims against Factory Mutual relating to the Hereford Ethanol Plant or the Builder's Risk Policy in the Dallas State Court Action or in any other court; and

All other relief is **DENIED**.

**IT IS SO ORDERED.**

 **###END OF MEMORANDUM OPINION AND SUMMARY JUDGMENT###**